# FILED

AUG 1 5 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OUR CHILDREN'S EARTH FOUNDATION, <br> Plaintiff, | Civil Case No. 3:06-CV-00168 MJJ |
| v. | THIRD AMENDED CONSENT DECREE |
| STANDARD IRON AND METALS COMPANY, <br> Defendant. | (Clean Water Act, 33 U.S.C. §§ 1251 et. seq.) |

WHEREAS, Our Children's Earth Foundation (hereinafter, "OCE") is a non-profit public benefit corporation dedicated to protecting the environment, including San Francisco Bay;

WHEREAS, Standard Iron and Metals Company (hereinafter, "SIMCO") is a California corporation engaged in the collection and recycling of scrap metal with a facility at 4525 San Leandro Street, Oakland, California ("the Facility"), and Jason Allen is the President of SIMCO;

WHEREAS, storm water discharges associated with industrial activity in California are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-

1

DWQ, as amended by Water Quality Order 92-12-DWQ and 97-03-DWQ (the "General Permit"), issued pursuant to Section 402 of the of the Federal Water Pollution Control Act, 33 U.S.C. section 1251 et seq. ("CWA" or "Clean Water Act");

WHEREAS, on April 27, 2005, pursuant to Clean Water Act Section 505(b)(1)(A), OCE served SIMCO, Jason Allen, the United States Environmental Protection Agency, the State Water Resources Control Board ("SWRCB"), the San Francisco Bay Regional Water Quality Control Board ("RWQCB"), and the United States Attorney General with a notice of intent to file suit ("60-Day Notice") under Sections 505(a)(1) and (f) for alleged violations of the Clean Water Act and the General Permit at the Facility;

WHEREAS, on January 10, 2006, OCE filed a complaint alleging violations of the Clean Water Act and the General Permit against SIMCO and Jason Allen ("the Complaint") in the United States District Court for the Northern District of California, thereby initiating this action, case number C06-0168 MJJ ("the Lawsuit");

WHEREAS, the parties to the Lawsuit ("the Parties") proposed a Consent Decree which was subsequently entered by the Court as an Order on September 5, 2006, at Docket [15];

WHEREAS, the Consent Decree dismissed OCE's claims against Jason Allen and set September 5, 2009 as the Termination Date for the Consent Decree, among other things;

WHEREAS, the objectives of the Consent Decree are to ensure that SIMCO continues to endeavor diligently to maintain compliance with the CWA and the General Permit, to ensure that SIMCO continues to use, implement, and improve ways, means, and methods to reduce the discharge of pollutants to waters of the United States, and to further the goals and objectives of the CWA and the General Permit;

WHEREAS, the Parties have twice requested that the Court extend the term of the

2

Consent Decree by an additional two years, and the Court accordingly entered the Parties'

Amended Consent Decree as an Order of the Court on September 11, 2009, at Docket [26], and

entered the Parties' Second Amended Consent Decree as an Order of the Court on August 30,

2011, at Docket [32];

WHEREAS, during the term of the Second Amended Consent Decree, SIMCO has made

significant and substantial progress towards meeting the objectives of the Consent Decree, and

has invested considerable monies in a state-of-the-art storm water storage and treatment system

("Storm Water Treatment Plant"), as set forth in the Notice Of Alternative Environmental

Enhancement Project Pursuant To Consent Decree and the exhibits thereto, filed on June 14,

2013, at Docket [33];

WHEREAS, the term of the Second Amended Consent Decree is scheduled to expire in

September 2013, before the Parties will be able to confirm that the new treatment system is

consistently effective in meeting the objectives of the Consent Decree;

WHEREAS, the Parties wish to extend the term of the Consent Decree for a final time,

by up to an additional two years, and have therefore submitted this Third Amended Consent

Decree for entry as an Order of the Court;

WHEREAS, this Third Amended Consent Decree restates the relevant provisions of the

Amended Consent Decree and amends certain substantive provisions concerning obligations of

the Parties during the next two years;

WHEREAS, SIMCO denies the material allegations of the Lawsuit and denies liability

for the causes of action alleged in the Complaint;

WHEREAS, by execution of – and performance of the obligations under – this Third

Amended Consent Decree, SIMCO does not admit any facts or conclusions of law;

3

WHEREAS, nothing contained in this Third Amended Consent Decree shall constitute or be construed, considered, offered or admitted, in whole or in part, as evidence of an admission or evidence of fault, wrongdoing, or liability by SIMCO, its officers, directors, agents or employees, in any administrative or judicial proceedings or litigation in any court, agency or forum whatsoever;

WHEREAS, this Third Amended Consent Decree shall be submitted to the United States Department of Justice for the statutory review period pursuant to 33 U.S.C. § 1365(c);

WHEREAS, all actions taken by SIMCO pursuant to this Third Amended Consent Decree shall be made in compliance with all applicable federal, state, and local rules and regulations;

WHEREAS, OCE and SIMCO agree that it is in their mutual interest to enter into this Third Amended Consent Decree and submit it to the Court for its approval and entry as an Order of the Court;

WHEREAS, the Parties agree to the terms specified in Parts I through XI of the Third Amended Consent Decree, below, which shall be enforceable by each of the Parties and by the Court;

WHEREAS, Part V of the Second Amended Consent Decree, below, consists of a dispute resolution mechanism that will allow the Parties to resolve most or all disputes that may arise under the Consent Decree ("Dispute Resolution") without consuming the time or resources of the Court;

NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:

4

## I. COMMITMENT OF SIMCO

1. Existing Compliance Measures. SIMCO shall continue to implement all measures specified in the Facility's June 2013 revision of its Storm Water Pollution Prevention Plan ("June 2013 SWPPP"), hereby incorporated in this Third Amended Consent Decree as if set forth fully herein), unless and until SIMCO modifies the June 2013 SWPPP to comply with this Consent Decree or with the General Permit or the CWA in which case SIMCO shall comply with its adopted revised SWPPP.

2. New and Modified Compliance Measures. To prevent storm water from coming into contact with contaminants at the Facility and to prevent or reduce the discharge of contaminated storm water and non-storm water from the Facility into the waters of the United States, as required by the General Permit, SIMCO shall implement the structural and non-structural storm water and non-storm water management measures specified in Part II, below, and, to the extent not already incorporated, shall amend the June 2013 SWPPP to incorporate each of these measures. SIMCO shall continue to implement the measures specified in Part II unless and until those measures are modified by SIMCO to comply with the General Permit or the CWA.

3. Designated Discharge Points: SIMCO has identified all points from which storm water is discharged from the Facility ("Designated Discharge Point"). Each Designated Discharge Point shall be identified and clearly labeled on the Storm Water Drainage Plan contained in the SWPPP.

## II. STORM WATER AND NON-STORM WATER MANAGEMENT MEASURES

4. Storm Water and Non-Storm Water Management Measures. In accordance with the terms of this Consent Decree and the General Permit, SIMCO shall implement the following storm water and non-storm water management measures as Best Management Practices

5

("BMPs") to the extent necessary to comply with the General Permit and make reasonable progress toward compliance with the Water Quality Standards ("WQS") and EPA Benchmark levels specified in Exhibit A to this Third Amended Consent Decree:

    **a. Designation of Process Areas**. The areas of the Facility in which sorting, crushing, torch-cutting, baling, shearing, and/or other processing activities (collectively, "Processing Activities") occur shall hereinafter be referred to and shall be designated on the Storm Water Drainage Plan contained in the Facility's SWPPP as the "Process Areas." SIMCO shall operate the Facility such that Processing Activities that generate finely divided metals, dust, shavings, or other materials that can be tracked or entrained in storm water discharging from the Facility, are conducted within the Process Areas to the extent feasible, considering the nature of the Facility's business operations.

    **b. Storm Drain Inlet/Catch Basin Inspection**. From October 1 to May 31 each year ("Wet Season"), SIMCO shall inspect all storm drain inlets/catch basins at the Facility at least twice per month and prior to any forecasted storm event that could reasonably be expected to result in a storm water discharge from the Facility. During this inspection, SIMCO shall clean each storm drain inlet/catch basin and any associated filter device to remove fugitive dusts or solids that might have entered the inlet/basin despite the placement of coverings over the inlet/basin and shall properly dispose of any sediments or other pollutants removed from storm drain inlets or catch basins. Any filter devices within the storm drain inlets/catch basins shall also be checked to ensure they are in working order and shall be repaired and/or replaced as necessary, if they are determined to be in a condition that would materially impair their efficacy.

**c. Storm Drain Inlet/Catch Basin Log**. SIMCO shall prepare and maintain a log of all inspections, maintenance and cleaning of storm drain inlets/catch basins at the Facility. The log shall identify the person who conducted the inspections, the date of inspection, the date of cleaning or maintenance, the date of filtration system replacement, and any other actions taken as a result of the inspection. SIMCO shall make the log available to OCE during inspections of the Facility conducted by OCE pursuant to the terms of this Consent Decree.

**d. Storm Water Treatment Plant Inspection**. During the Wet Season, SIMCO shall inspect the Storm Water Treatment Plant at least twice per month and prior to any forecasted storm event that could reasonably be expected to result in a storm water discharge from the Facility. During this inspection, SIMCO shall clean the Storm Water Treatment Plant to remove any materials that may impede its performance. The filter devices within the storm water filter system shall also be checked for integrity and replaced as necessary.

**e. Storm Water Treatment Plant Log**. SIMCO shall prepare and maintain a log of all inspections, maintenance and cleaning of the Storm Water Treatment Plant. The log shall identify the person who conducted the inspections, the date of inspection, the date of cleaning or maintenance, the date of filtration system replacement, and any other actions taken as a result of the inspection. SIMCO shall make the log available to OCE during inspections of the Facility conducted by OCE pursuant to the terms of this Consent Decree.

**f. Site Sweeping and Cleaning**. SIMCO shall implement a routine maintenance site sweeping and cleaning plan to prevent the tracking of metal shavings and other pollutants outside the active operational areas of the Facility and to minimize the area where metal shavings and other pollutants are dispersed ("Sweeping Plan"). The purpose of the Sweeping

7

Plan shall be to prevent, to the extent reasonably possible, the entry of metal shavings and other pollutants into storm water at the Facility. The Sweeping Plan shall:

(i) specify that sweeping and cleaning shall be designed to minimize tracking and other dispersal of pollutants on paved areas of the Facility;

(ii) specify that, in areas where material stockpiles have been cleared, mechanical or manual sweeping of the area shall be conducted prior to further use of those areas for material stockpiling;

(iii) identify areas where mechanical sweeping is feasible, areas where manually sweeping only is feasible, areas where sweeping is not reasonably feasible (such as under piles of metal not reasonably feasible to move);

(iv) identify areas where daily sweeping is likely needed during the Wet Season, and areas where less frequent sweeping during the Wet Season is likely to be adequate;

(v) identify the more limited sweeping and cleaning necessary during times other than the Wet Season to reduce pollutant accumulation and prevent dust from blowing into hard-to-clean areas where storm water is likely to reach during the Wet Season;

(vi) identify triggers for more frequent ad hoc sweeping or cleaning;

(vii) identify the type of equipment that will be employed for sweeping;

(viii) specify that, at least annually, SIMCO shall conduct a thorough inspection of the Facility and, to the extent warranted by this inspection, perform additional comprehensive site cleaning with power wash or other methods reasonably calculated to remove significant accumulations of finely divided metals, dust, shavings, or other pollutants;

8

(ix) specify that SIMCO shall not discharge any waste fluids or solid wastes generated in site cleaning to storm drain inlets or waterways; and

(x) specify that SIMCO shall collect and dispose of all wastes generated during Facility cleaning and sweeping in a manner that complies with all local, state, and federal laws.

SIMCO shall adjust and update this Sweeping Plan as changes in circumstances warrant. SIMCO shall provide OCE with a copy of any revised Sweeping Plan within fourteen (14) business days of adopting such revised Plan. OCE shall have fourteen (14) days to suggest revisions to the Sweeping Plan and provide SIMCO with its reasons for such revisions. Within fourteen (14) days, SIMCO shall either adopt the revisions suggested by OCE or provide OCE with its reasons for rejecting any such revisions. If the parties are unable to agree on all material provisions of the Sweeping Plan, either Party may invoke Dispute Resolution, as provided in this Consent Decree.

**g. Sweeping and Cleaning Log.** SIMCO shall prepare and maintain a log or checklist of all site sweeping and cleaning performed at the Facility. The log or checklist shall demonstrate that, at least daily, SIMCO supervisory personnel and/or their designee(s) have determined that all applicable site sweeping and cleaning activities set forth in the Sweeping Plan have been completed by SIMCO personnel. The log shall contain the printed name and signature (or signed initials) of each SIMCO employee making this determination. SIMCO shall make the log available to OCE during inspections of the Facility conducted by OCE pursuant to the terms of the Consent Decree. SIMCO shall provide OCE with the log or checklist three times per year while this Third Amended Consent Decree is in effect, on the following schedule: on or before October 15 (for the time period June-September), on or

9

before February 15 (for the time period October-January), and on or before June 15 (for the time period February-May).

**h. Tracking.** SIMCO shall implement appropriate additional BMPs to reduce or prevent visible tracking of significant pollutants from the Facility by vehicle traffic, to the extent that the sweeping and cleaning actions specified in the preceding subparagraph and/or other actions required by this Consent Decree are insufficient to prevent such visible tracking.

**i. Hazardous Waste Materials Segregation and Handling.** SIMCO shall continue to:

(i) identify any toxic and hazardous materials (such as lead batteries, solvents, liquid toxic or hazardous wastes, or petroleum contaminated materials) improperly or mistakenly delivered to the Facility, which does not accept such materials as part of its business operations; and

(ii) segregate such identified materials from other materials at the Facility and store all such materials under cover or in a container on an impermeable surface, out of potential contact with flooding associated with storm water, with the exception of satellite accumulation stations, which may be located on a permeable surface.

**j. Vehicle and Equipment Management.** SIMCO shall continue to implement BMPs to reduce or minimize pollutant release from equipment such as trucks, forklifts, hydraulic lifts, and other heavy equipment. Such BMPs include:

(i) daily inspections for evidence of leaks from such equipment, and

(ii) cleaning up of spills, drips, or leaks from such equipment as soon as reasonably possible, and in no event later than in advance of forecasted rainfall events.

10

Any spilled substances and absorbent materials used in cleaning up spills shall be disposed of in accordance with all local, state, and federal laws and regulations.

**k. Vehicle and Equipment Maintenance.** SIMCO shall not conduct vehicle or mobile equipment maintenance or repair in outdoor, uncovered areas during rainfall events. Whenever SIMCO conducts such maintenance or repair activities in non-covered areas, SIMCO shall afterwards inspect the area where the maintenance or repair occurred and clean up any waste products, including pollutant-containing fluids, deposited or spilled on the ground as a result of the maintenance or repair.

**l. Additional Structural Controls.** SIMCO has implemented and shall maintain in operation the following structural storm water and non-storm water management measures:

i. Steel covers for all storm water catch basins at the Facility. SIMCO shall use these covers at all appropriate times during the dry weather season and during extended periods of dryness in the wet weather season.

ii. Two collection bins for machine shop borings/turnings that minimize contact of potential pollutants in these borings/turnings with the surface of the Facility. One collection bin is designed to facilitate collection and movement of the borings/turnings by the Facility's hoppers, and the other bin is designed with vehicular drive-on unloading capacity. Each bin is designed to drain any liquid into a separate compartment of the bin, with such liquid to be drained into drums and either (i) taken offsite by a licensed waste hauler for disposal in accordance with all applicable local, state, and federal laws and regulations, or (ii) discharged to the sanitary sewer in accordance with all applicable laws and regulations.

iii. A storm water collector to intercept storm water flow in the active driveway
area of the Facility bordering San Leandro Street and direct such flow to the unpaved
area in the northeast corner of the Facility. This storm water flow will be managed via
infiltration into this unpaved area and/or by being directed into the Facility's existing
storm water collection and treatment system.

5. Maintenance of Structural Controls. SIMCO shall maintain all structural storm water
and non-storm water management measures at the Facility in good operating condition at all
times.

6. Amendment of SWPPP. This provision of the original Consent Decree is no longer
operative and has been removed from the Third Amended Consent Decree.

### III. SAMPLING, MONITORING, INSPECTION & REPORTING

7. Sampling Program. SIMCO shall collect samples according to the following sampling
schedule:

a. During the Wet Seasons for 2013-14 and 2014-15, SIMCO shall collect storm
water samples from each Designated Discharge Point during at least three (3) storm events
that are either (i) qualifying storm events as specified by the General Permit, or (ii) storm
events that occur at least in part during normal business hours, or that result in storm water
discharges occurring at the start of or during normal business hours, even if such events are
not qualifying storm events.

b. This provision of the Second Amended Consent Decree is no longer operative and
has been removed from the Third Amended Consent Decree.

c. If three consecutive samples from each of the Designated Discharge Points
demonstrate that the concentration of a constituent is below the WQS level set forth in

12

Exhibit A for that constituent, SIMCO need not conduct additional sampling for that constituent during the duration of this Consent Decree unless otherwise required by the General Permit.

d. SIMCO shall analyze each storm water sample collected pursuant to (a) for each of the parameters listed in Exhibit A, and also for biochemical oxygen demand (BOD). Should operations materially change at the Facility, SIMCO shall conduct sampling for any additional toxic priority pollutants listed in 40 C.F.R. § 131.38 likely to be present in SIMCO's storm water discharges as a result of the changed operations.

e. This provision of the Second Amended Consent Decree is no longer operative and has been removed from the Third Amended Consent Decree;

f. This provision of the Second Amended Consent Decree is no longer operative and has been removed from the Third Amended Consent Decree;

g. SIMCO shall provide rain gauge data and flow meter data to OCE on a bimonthly (every eight weeks) basis during the 2013-14 and 2014-15 Wet Seasons.

8.    Analysis. All storm water samples collected by SIMCO pursuant to paragraph 7(a) shall be delivered to a California state certified environmental laboratory for analysis within the time needed for analysis within laboratory method allowable hold times. The laboratory shall thereafter conduct analysis according to its standard protocols for the EPA Analysis Methods set forth in Exhibit A and shall use EPA Standard Method 5210B for the BOD analysis.

9.    Reporting. SIMCO shall provide complete results from SIMCO's sampling and analysis to OCE within thirty (30) days after the end of the applicable Wet Season, and shall provide a chart in digital or hardcopy form that summarizes the results of all the samples and includes the WQS and EPA Benchmark levels for comparison. The summary chart shall present

13

the sample summaries and WQS and EPA Benchmark levels included for comparison in consistent units of measurement and shall be submitted to OCE along with copies of the accompanying lab paperwork.

10. Compliance with Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology. Effluent Limitation B(3) of the General Permit requires that BMPs be developed and implemented to achieve Best Available Technology Economically Achievable ("BAT") and Best Conventional Pollutant Control technology ("BCT"). SIMCO agrees to develop and implement BMPs necessary to comply with the BAT/BCT standard in the General Permit. These BMPs shall include, but are not limited to, the measures identified in Paragraph 4 of this Consent Decree. SIMCO will compare analytical results of storm water samples with the Benchmark levels in Exhibit A to evaluate the effectiveness of BMPs. If SIMCO's storm water sampling results exceed a Benchmark level in Exhibit A, SIMCO agrees to comply with the Action Plan requirements specified below.

11. Compliance with Applicable Water Quality Standards. Receiving Water Limitation C(2) of the General Permit requires that SIMCO "not cause or contribute to the exceedance of any applicable water quality standards." The WQS levels in Exhibit A are either EPA Benchmark levels or are taken from the RWQCB's Water Quality Control Plan ("Basin Plan"), which incorporates the California Toxics Rule, codified at 40 C.F.R. § 131.38 ("CTR") . The Parties agree that if the WQS in the CTR or the Basin Plan that apply to the constituents in Exhibit A change during the term of this Consent Decree, or if Receiving Water Limitation C(2) of the General Permit is revised by the SWRCB during the term of this Consent Decree, then this Consent Decree's requirements will be deemed revised to reflect the current, applicable standards. SIMCO agrees to develop and implement BMPs designed to make reasonable

14

progress towards achieving the WQS levels in Exhibit A. SIMCO shall compare analytical

results of storm water samples with the WQS Levels to evaluate the effectiveness of its BMPs. If

any of SIMCO's storm water sampling results exceed the WQS levels, SIMCO agrees to comply

with the Action Plan requirements specified below.

 12. <u>Action Plan</u>. Within fifteen (15) days of receiving any sample results showing that

pollutant concentrations in SIMCO's storm water discharges have exceeded the WQS or EPA

Benchmark levels specified in Exhibit A, SIMCO shall notify OCE of the exceedances by

providing OCE with the laboratory results for the sampling event, and a chart in digital or

hardcopy form that summarizes those laboratory results and includes the WQS and EPA

Benchmark levels for comparison. By July 15 following any Wet Season for which SIMCO has

reported exceedances, SIMCO shall prepare and send to OCE an action plan or revised action

plan designed to comply with the General Permit and make reasonable progress toward

achieving the exceeded WQS or EPA Benchmark levels ("Action Plan"). Each Action Plan shall

set forth the sample results showing the exceedance, the possible cause and/or the source of the

exceedance, measures that SIMCO will take to comply with the General Permit and make

reasonable progress toward reducing the level of pollutants associated with the exceedances in

future storm water discharges to or below the WQS or EPA Benchmark levels, and a schedule to

implement the proposed BMPs either within thirty (30) days or at the earliest practicable time,

whichever is later. Should SIMCO decide that structural measures are necessary to resolve

pollutant problems, and such structural measures will require more than 30 days to design and

install, the Action Plan shall specify the reason for the additional time required and the expected

date of implementation. SIMCO shall not unreasonably delay in implementing additional

structural measures. To the extent not already implemented, the Action Plan shall consider the

following BMPs:

(a) routing some or all of the storm water flow from the Facility into the local

publicly owned treatment works ("POTW") sanitary sewage collection system via piping or

collection in a tanker truck which may be transported to the POTW;

(b) installation of a roof/canopy structure over some or all of the pollution generating

areas of the Facility that are currently uncovered;

(c) installation of additional storm water treatment measures, such as improved

pollutant filters;

(d) using regenerative sweepers and high efficiency vacuum-assisted dry sweepers to

substantially reach and clean all material areas where mechanized sweepers cannot

effectively reach;

(e) specifying comprehensive, site specific storm water testing within the Facility to

identify areas within the Facility that are responsible for storm water pollutant generation and

the adoption of BMPs specifically tailored for such areas; and

(f) covering, storing, and managing waste material storage bins containing finely

divided materials to reduce exposure of stored materials to storm water.

If OCE believes that the Action Plan does not comply with the General Permit or make

reasonable progress toward achieving the levels set forth in Exhibit A, OCE shall have thirty

(30) days to comment on and suggest revisions to the Action Plan. Within thirty (30) days of

receiving OCE's comments, SIMCO shall adopt OCE's suggested revisions or provide OCE

with a statement of reasons why those revisions were not adopted. If SIMCO does not adopt

OCE's revisions and OCE believes that the Action Plan adopted by SIMCO does not comply

with the General Permit or make reasonable progress toward achieving the levels set forth in Exhibit A, OCE may invoke Dispute Resolution, as specified in this Consent Decree.

12A. SWPPP Amendment. At the conclusion of each year's rainy season, SIMCO shall (a) conduct an Annual Comprehensive Site Compliance Evaluation, as specified in Section A, paragraph 9 of the General Permit, and (b) based on that Evaluation, revise the Facility's SWPPP to incorporate additional or modified storm water and/or non-storm water management measures that SIMCO determines are required by the General Permit, if any.

13. Copies of Documents. SIMCO shall provide OCE with (a) copies of any submittal to the SWRCB and/or RWQCB regarding the Facility's compliance with the General Permit within seven (7) days of such submittal, and (b) copies of any revisions to the Facility's SWPPP within seven (7) days of such revisions being completed and adopted by SIMCO.

14. OCE Site Inspections and Sampling. OCE may perform up to two (2) physical inspections of the Facility after the entry of this Third Amended Consent Decree. Such inspections may include sampling of surface water and/or Storm Water Treatment Plant effluent at the Facility and which may further include the taking of photographs, video/film and field notes. Inspections pursuant to this section must comply with the following requirements.

a. OCE must provide notice to SIMCO at least twenty-four (24) hours preceding the inspection, and such notice must be provided between the hours of 8am and 4pm on a weekday (Monday through Friday). The inspection must be conducted on a weekday and both begin and end between the hours of 8am and 4pm. To be effective, the written notice must include the date, time and estimated duration of the inspection, and the names of the OCE representatives who will attend.

b. No more than three (3) OCE representatives may attend any inspection. Prior to the inspection, each OCE representative entering the Facility shall execute a release and waiver of liability relating to their presence at the Facility during the inspection. While present at the Facility for an inspection, OCE representatives shall comply with all safety directives of SIMCO personnel. Each inspection shall last no longer than four hours.

c. OCE shall provide copies to SIMCO of all sample results, photographs, video/film and field notes taken during inspections. OCE and its agents attending the inspections shall treat as confidential all information collected at or resulting from these inspections, including sample results, photographs, video/film, and field notes taken by OCE, and information or documents generated by SIMCO or its consultants and provided to OCE, that SIMCO identifies as confidential business information ("CBI"), provided that the information is in fact CBI as defined by 40 CFR Part 2, Subpart B. If OCE disagrees with any CBI claims, OCE shall notify SIMCO within thirty days of receipt of notice of the CBI claim. Thereafter, any party may seek Dispute Resolution to resolve whether the CBI claim is valid. OCE shall not disclose any CBI information, except to the extent that disclosure to public agencies or the Court is necessary to enforce this Third Amended Consent Decree. If such disclosure by OCE is necessary, OCE shall inform SIMCO of any information that will be released and shall restrict the release of any material SIMCO identifies as CBI as follows:

(i) OCE shall only provide such designated CBI to public agencies that have procedures for protecting the confidentiality of CBI, and OCE will inform such agencies that the materials are being submitted with a CBI claim;

(ii) OCE shall only provide such designated CBI to the Court under seal with a request that the court treat the material as CBI; and

18

(iii) OCE will continue to so treat the CBI as confidential unless and until a court or public agency officially determines that the information is not CBI within the meaning of applicable law.

Within thirty (30) days following the Termination Date of this Third Amended Consent Decree, OCE shall destroy or return to SIMCO all designated CBI in OCE's possession along with any non-CBI photographs and video/film that were taken during any inspection of the Facility pursuant to the Consent Decree, as amended, or prior to the Effective Date of the original Consent Decree.

15. Training. SIMCO shall conduct annual training for all of its workers, other than office and clerical personnel, to explain the requirements of this Third Amended Consent Decree, the SWPPP, and the General Permit to the extent applicable to such worker. Additionally, upon hiring new employees other than office or clerical personnel, SIMCO shall conduct training for such new employee to explain the requirements of this Third Amended Consent Decree, the SWPPP, and the General Permit. The training shall focus on the worker's role in implementing storm water and non-storm water management measures. All training shall be conducted bilingually (i.e., Spanish/English or other pertinent language), to the extent SIMCO employs any persons whose English-language skills are insufficient to allow them to comprehend the training in English. SIMCO shall integrate any new training requirements resulting from this Third Amended Consent Decree in its SWPPP.

## IV. MITIGATION PAYMENTS, FEES, AND COSTS

16. Mandatory Payments. On or before October 1, 2013, SIMCO shall tender payment to Environmental Advocates for deposit in the Environmental Advocates Client Trust Fund account the total sum of $6,400 for attorneys fees and costs incurred related to the Third Amended

19

Consent Decree. By October 1, 2013, SIMCO shall also tender payment of $5,000 to Environmental Advocates to fund all of OCE's fees and costs of monitoring of compliance with the Third Amended Consent Decree during the 2013-14 Wet Season. If the Third Amended Consent Decree has not terminated by October 1, 2014, SIMCO shall on that date or within thirty (30) days thereafter tender payment of $5,000 to Environmental Advocates to fund all of OCE's fees and costs of monitoring of compliance with the Third Amended Consent Decree during the 2014-15 Wet Season.

17. Liquidated Mitigation Payments. SIMCO shall pay liquidated mitigation for each of the following events:

(a) $200 per day for every business day (Monday through Friday, excluding state and federal holidays) past the due date that SIMCO fails to submit to OCE any document, report or other communication required under the Third Amended Consent Decree, where SIMCO's failure was not reasonably excusable and timely cured, and provided that OCE's position has prevailed in Dispute Resolution;

(b) $200 per day for every business day (Monday through Friday, excluding state and federal holidays) past the date that OCE provided written notice to SIMCO that a document, report or other communication or measure of specific performance required by this Third Amended Consent Decree does not comply with the Third Amended Consent Decree and SIMCO has failed to correct the non-performance, provided that OCE's position has prevailed in Dispute Resolution;

(c) $2,500 for each failure of SIMCO to collect a storm water sample required by paragraph 7(a) of this Third Amended Consent Decree, unless SIMCO's failure to sample the number of requisite storm events is excused by the insufficient occurrence of storm events.

20

(d) This provision of the Second Amended Consent Decree is no longer operative and has been removed from the Third Amended Consent Decree;

(e) This provision of the Second Amended Consent Decree is no longer operative and has been removed from the Third Amended Consent Decree;

(f) For each exceedance of an EPA Benchmark level specified in Exhibit A, other than for chemical oxygen demand ("COD") and electrical conductivity ("EC"), and for each exceedance of an EPA Benchmark level for COD or EC specified in Exhibit A by more than 135 percent, that occurs in laboratory results from storm water sampling conducted pursuant to paragraph 7(a) on or after October 1, 2014:

- $350 per exceedance during the first sampling event,
- $500 per exceedance during the second sampling event, and
- $750 per exceedance during the third sampling event,

unless OCE agrees, or SIMCO has prevailed in Dispute Resolution in demonstrating, that SIMCO (i) has augmented its treatment system such that the system has the net capacity to process storm water without overflow during a one-hour, two-year storm event, and (ii) employs filter media or physio-chemical treatment consistent with the character of SIMCO's pollutants that is capable of reducing pollutant concentrations to below EPA Benchmarks.

(g) The payments specified in (a) through (f), above, shall be subject to a cap of the lesser of $10,000 per storm event, or a total annual liquidated mitigation payment liability of no more than $25,000.

18. Reduction in Liquidated Mitigation Payments. SIMCO shall be allowed either a fifty percent (50%) or seventy-five percent (75%) reduction, as specified further below, in any liquidated mitigation payments due under paragraph 17 of this Third Amended Consent Decree

21

if SIMCO tenders the reduced payment along with a certification signed under penalty of perjury stating that SIMCO has spent or will, within one year, spend or be under contract to spend the balance of the sum that would otherwise be due as liquidated mitigation payments on alternative environmental enhancements.

Alternative environmental enhancements include:

(a) construction of indoor or covered recycling facilities at the Facility, including the construction of canopies over processing or equipment parking areas (50% reduction);

(b) construction and operation of the appurtenances necessary to either (i) discharge storm water runoff to a POTW sanitary sewer system, in conformity with the requirements of the POTW, or (ii) eliminate the entirety of the Facility's storm water discharges to waters of the Unites States, in conformity with all local, state, and federal laws and regulations (50% reduction);

(c) the acquisition of, or subsequent structural modification to, an improved new state of the art storm water filtration system designed for metal recycling facilities and approved by OCE, including any storm water retention capacity integrated with the filtration system (50% reduction);

(d) acquisition and operation of a regenerative sweeper or high efficiency vacuum-assisted dry sweeper (75% reduction);

(e) entering into a contractual arrangement with a service that would provide sweeping with a regenerative sweepers or high efficiency vacuum-assisted dry sweepers on a regular basis (75% reduction);

22

(f) increasing the frequency of sweeping with existing equipment and/or hiring of additional personnel to perform sweeping related activities, pursuant to a modified sweeping plan approved by OCE (75% reduction); and

(g) retention of Fall Creek Engineering or another qualified consultant to conduct analysis of storm water flow and quality, to design and/or construct new structural BMPs intended to reduce contaminant loads entering the storm water treatment system, or to develop further modifications to the storm water treatment system that are intended to reduce contaminants in system effluent (75% reduction after SIMCO has paid at least $15,000 in consulting fees and costs and/or for improvements or equipment recommended by the consultant during the term of this Third Amended Consent Decree).

Within thirty (30) days of completing an alternative environmental enhancement project, SIMCO shall provide OCE, the Court, and the United States Department of Justice with a written statement explaining how SIMCO's expenditures on the project met the conditions of this paragraph. If Dispute Resolution determines that SIMCO failed to meet all conditions of this paragraph, SIMCO must pay the balance of the liquidated mitigation payment sum not yet paid, along with interest at the rate of five percent (5%) per annum on that balance, within thirty (30) days of the Dispute Resolution determination.

19. Tendering of Liquidated Mitigation Payments. SIMCO shall tender payment of any liquidated mitigation payments due under this Consent Decree to Environmental Advocates for deposit in the Environmental Advocates Client Trust Fund, and Environmental Advocates shall thereafter transmit such payments to the Rose Foundation for the Environment. The liquidated mitigation payments shall be used for projects relating to the reduction, prevention, or mitigation

of, or research on, the effects of discharges of pollutants to the San Francisco Bay and/or San Leandro Bay.

## V. DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT DECREE

20. Dispute Resolution. If OCE believes that SIMCO is not in compliance with this Third Amended Consent Decree or the Clean Water Act and/or wishes to invoke Dispute Resolution where specified in the Third Amended Consent Decree, then OCE may send a letter (the "Request") to SIMCO requesting that SIMCO correct the non-compliance within a specified reasonable time. If OCE does not send a Request within forty-five (45) days of receiving notice of the alleged non-compliance, OCE shall be deemed to have waived any contention regarding the alleged non-compliance.

(a) At any time within thirty (30) days after receipt of a Request, SIMCO may send a letter (the "Response") to OCE either (i) agreeing to implement OCE's request, or (ii) proposing a compromise. If SIMCO does not send a Response within thirty (30) days of receipt of a Request, SIMCO shall be deemed to have agreed to implement the Request.

(b) At any time within thirty (30) days after receipt of a Response, OCE may send a letter (the "Reply") to SIMCO either (i) proposing a different compromise, or (ii) invoking arbitration. If OCE does not send a Reply within 30 days of receipt of a Response proposing a compromise, OCE shall be deemed to have accepted the compromise proposed in the Response.

(c) SIMCO shall be deemed to have agreed to implement OCE's different compromise proposed in a Reply if SIMCO does not either (i) respond to the Reply within thirty (30) days of receipt or (ii) invoke arbitration.

24

(d) So long as neither Party invokes arbitration, the Parties may exchange further Responses and Replies within corresponding thirty-day time windows.

(e) The Parties agree that Steven Weissman is a suitable arbitrator for any dispute in which a Party invokes arbitration under this Third Amended Consent Decree. If Mr. Weissman is unavailable, the parties shall each propose three alternative arbitrators and thereafter endeavor in good faith to select a mutually agreeable arbitrator from this list within thirty days of any party proposing in writing its list of alternative mediators. If the parties are unable to reach agreement within this time, the Court shall by motion by any party appoint an arbitrator.

(f) Any letter invoking arbitration shall:

(i) identify the arbitrator and be copied to the arbitrator;

(ii) enclose copies of this Third Amended Consent Decree, all relevant documentation related to the issue, including any relevant sampling results, and the Request and all Responses and Replies (the "Submittals");

(iii) explain why (A) the invoking Party's final Submittal is "right" (i.e., the specified actions are necessary to achieve compliance if the invoking Party is OCE or sufficient to achieve compliance if the invoking Party is SIMCO) and (B) the opposing Party's final Submittal is "wrong" (i.e., the specified actions are insufficient to achieve compliance if the opposing Party is OCE or unnecessary to achieve compliance if the opposing Party is SIMCO) ("Letter Brief");

(iv) enclose all documents (including up to five declarations; declarants must be made available in person for cross-examination at the arbitration hearing) and other evidence the invoking Party contends supports its explanation ("Evidence");

(v) inform the arbitrator of the date (within thirty (30) days after the opposing Party's receipt of the letter) by which the opposing Party will file and serve its Letter Brief and Evidence; and

(vi) ask the arbitrator for the first available hearing date after the deadline for submission of the opposition Letter Brief and Evidence.

(g) Each arbitration hearing shall last no more than one day, and all arbitrator's fees and costs due in advance of the hearing shall be paid initially by SIMCO. The arbitrator shall solely be empowered to choose one Party's final Submittal as "right" and the other Party's final Submittal as "wrong." The arbitrator shall not be empowered to compromise. If the arbitrator finds neither final Submittal is "right" then the arbitrator shall determine which of the two final Submittals is the most "right," and the other final Submittal shall be deemed "wrong." The arbitrator's decision on each issue shall be final and binding as to that issue. With respect to any dispute concerning storm water compliance measures, the arbitrator shall find "right" the Submittal which most closely complies with the requirements of the General Permit.

(h) If SIMCO's final Submittal is wrong, then the arbitrator shall issue an order directing SIMCO to (i) pay OCE's reasonable attorneys' fees and costs (to be fixed according to agreement of the Parties or, failing that, pursuant to a procedure set by the arbitrator) incurred in the arbitration proceeding, and (ii) implement OCE's final Submittal.

(i) If OCE's final Submittal is wrong, then the arbitrator shall issue an order stating that OCE and SIMCO shall each bear their own attorneys' fees and costs incurred in the arbitration proceeding.

21. Motion to Show Cause. If a Party violates an arbitrator's order issued pursuant to the above procedure, the Parties agree that the exclusive remedy is to file a Motion to Show Cause ("Motion") with the Court. The Motion shall be limited solely to a request that the Court (a) determine whether a Party is in violation of the arbitrator's order, (b) if so, require the violating Party to comply with the arbitrator's order within a reasonable time frame, and (c) identify the Party prevailing or substantially prevailing on the Motion ("Prevailing Party"). Fees and costs recovery shall be available to the Prevailing Party under the standard established by 33 U.S.C. § 1365(d).

## VI. JURISDICTION

22. For purposes of this Third Amended Consent Decree only, the Parties stipulate that the United States District Court has jurisdiction over the parties and the subject matter of this Lawsuit and that venue is appropriate in the Northern District of California. The Parties further stipulate, for purposes of this Third Amended Consent Decree only, that OCE has standing to bring this Lawsuit against SIMCO.

## VII. DISMISSAL OF JASON ALLEN

23. As of the Effective Date of the original Consent Decree, it was stipulated by the Parties and ordered by the Court that the Lawsuit and all claims therein against Jason Allen were dismissed with prejudice. SIMCO's obligations under this Third Amended Consent Decree shall not be waived or otherwise discharged because of any claim of financial hardship by SIMCO, unless SIMCO has filed for bankruptcy protection and ceased all operations at the Facility that could contribute pollutants to storm water being discharged from the Facility.

27

## VIII. RELEASE AND WAIVER OF COVERED CLAIMS

24. As of the Effective Date of the original Consent Decree, OCE on its own behalf and on behalf of its members, officers, directors, attorneys, agents, servants, stockholders, employees, representatives, affiliates, subsidiary and parent corporations, partners, assigns and successors fully released and forever discharged SIMCO and Jason Allen and their officers, directors, attorneys, agents, servants, stockholders, employees, representatives, affiliates, subsidiary and parent corporations, partners, assigns and successors from any and all rights, claims and actions related to or arising out of the causes of action and alleged violations of law asserted in the Lawsuit. The released claims include any and all Covered Claims (as defined below). This release is not affected by and shall survive the termination of this Third Amended Consent Decree.

25. As of the Effective Date of the original Consent Decree, SIMCO and Jason Allen on their own behalf and on behalf of their officers, directors, agents, servants, stockholders, employees, representatives, affiliates, subsidiary and parent corporations, partners, assigns and successors fully released and forever discharged OCE and its members, officers, directors, attorneys, agents, servants, stockholders, employees, representatives, affiliates, subsidiary and parent corporations, partners, assigns and successors from any and all rights, claims and actions related to or arising out of the causes of action and alleged violations of law asserted in the Lawsuit. The released claims include any and all Covered Claims (as defined below). This release is not affected by and shall survive the termination of this Third Amended Consent Decree.

26. This Consent Decree and its Amendments are a final and binding resolution between OCE and SIMCO and between OCE and Jason Allen of the following causes of action

28

(collectively, "Covered Claims"): any and all claims that were or could have been asserted in the
Lawsuit regarding the Facility's compliance with the Clean Water Act at any time up to the
Termination Date of this Third Amended Consent Decree, including all claims relating to the
Facility's Storm Water Pollution Prevention Plan, discharges of storm water containing
pollutants from the Facility, implementation of best management practices at the Facility to
reduce or eliminate pollutants from storm water discharges, the Facility's obligations under the
National Pollutant Discharge Elimination System, and the Facility's obligations and
responsibilities under the General Permit.

## IX. EFFECT OF FACTORS OUTSIDE CONTROL OF SIMCO

27. SIMCO will not be in default or breach of this Third Amended Consent Decree by
reason of any event that constitutes a force majeure. For the purposes of this Third Amended
Consent Decree, a force majeure is defined as any event arising from causes beyond the control
of SIMCO, or its contractors, subcontractors, or consultants, which delays or prevents
performance, including, without limitation, acts of God, acts of war or war-like operations, acts
of terrorism, acts of public enemies, riot, insurrection, fire, earthquake, flood, explosion, restraint
by court order, restraint by public authority, delay by any governmental agency in issuing any
necessary permit or approval, or other cause beyond SIMCO's reasonable control. Normal
inclement weather, economic hardship, and increased costs shall not constitute a force majeure.
In the event of a force majeure, the time for performance of the activity delayed by the force
majeure shall be extended for the time necessary to allow completion of the delayed activity. In
the case of delay by any governmental agency in issuing any necessary permit or approval, the
extension of time shall be equal to the number of days from SIMCO's application for the permit
or approval until the governmental agency's issuance thereof. If SIMCO seeks to rely on this

paragraph, it shall bear the burden to show a force majeure that it could not reasonably have been expected to avoid or overcome by the exercise of reasonable diligence.

## X. EFFECTIVE DATE AND TERMINATION DATE OF CONSENT DECREE

28. The "Effective Date" specified in the original Consent Decree was September 5, 2006, the date that the Court first entered this Consent Decree as an Order of the Court.

29. This Third Amended Consent Decree – and the Parties' respective rights to enforce any obligations hereunder – shall terminate on the "Termination Date," defined for purposes of this Third Amended Consent Decree as the earlier of:

(a) September 5, 2015, or

(b) the date that SIMCO provides OCE with laboratory results for three consecutive sampling events which demonstrate that, for each event,

(i) the concentrations of all constituents other than COD and EC were below the EPA Benchmark levels set forth in Exhibit A for those constituents, and

(ii) the concentrations of COD and EC were each below 135 percent of the EPA Benchmark levels set forth in Exhibit A for those constituents, or, if over 135 percent, results of multi-species bioassays conducted pursuant to San Francisco Bay Regional Water Quality Control Board protocols demonstrate that the COD and EC levels in storm water effluent do not result in toxicity to saltwater organisms, as measured by standards agreed upon by the Parties.

## XI. MISCELLANEOUS PROVISIONS

30. Integrated Consent Decree. This Third Amended Consent Decree contains the sole and entire agreement and understanding of the Parties with respect to the entire subject matter hereof, and any and all prior discussions, negotiations, commitments and understandings related

hereto. No other agreements, covenants, representations, or warranties not specifically referred to
herein, express or implied, oral or written, shall be deemed to exist or to bind any of the Parties.

31. Construction. The language in all parts of this Third Amended Consent Decree,
unless otherwise stated, shall be construed according to its plain and ordinary meaning.

32. Modification. This Third Amended Consent Decree may only be modified by the
written agreement of all Parties hereto. Any such modification shall only become effective upon
approval by the Court.

33. Successors. This Third Amended Consent Decree shall apply to, be binding upon, and
inure to the benefit of, the Parties and their successors and assigns.

34. Notices and Payments. Any notice to OCE required or permitted by this Third
Amended Consent Decree shall be sent via electronic mail to the following e-mail address
(unless impracticable): jisaacs@enviroadvocates.com. To the extent electronic transmission is
impracticable, a hard copy shall be mailed to Environmental Advocates at the address below.
The SIMCO payment to Environmental Advocates required by this Third Amended Consent
Decree shall be mailed, hand-delivered, or e-mailed to the following address: Jodene Isaacs,
Environmental Advocates, 5135 Anza Street, San Francisco, California 94121,
jisaacs@enviroadvocates.com. Any notice to SIMCO required or permitted by this Consent
Decree shall be mailed, hand-delivered, or e-mailed to both of the following addresses: (a) Jason
Allen, President, Standard Iron and Metals Company, 4525 San Leandro Street, Oakland,
California 94601, jallen@standardiron.net and (b) Donald Sobelman, Barg Coffin Lewis &
Trapp LLP, 350 California Street, 22nd Floor, San Francisco, California 94104,
des@bcltlaw.com.

31

35. Review of Consent Decree by Department of Justice. The Parties have submitted this Third Amended Consent Decree to the United States Department of Justice ("DOJ") for the review period required under the Clean Water Act, 33 U.S.C. section 1365(c). DOJ does not object to the Third Amended Consent Decree. DOJ's comments on the original Consent Decree were filed with the Court at Docket [17], and DOJ did not object to the Court entering judgment in the Lawsuit pursuant to the terms of that original Consent Decree. DOJ's comments on this Third Amended Consent Decree will also be filed with the Court. These comments are hereby incorporated in this Third Amended Consent Decree as if set forth fully herein.

36. Execution in Counterparts. This Third Amended Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

37. Facsimile Signatures. Signatures of the Parties to this Third Amended Consent Decree transmitted by facsimile shall be deemed binding.

38. Continuing Jurisdiction of Court. The "Court" specified in this Third Amended Consent Decree is the United States District Court for the Northern District of California. The Court shall retain jurisdiction to enforce all provisions of this Third Amended Consent Decree during its term.

**a. Court Approval**. If for any reason the Court should decline to approve this Third Amended Consent Decree in the form presented, the Parties agree to negotiate in good faith to modify the Third Amended Consent Decree to address the Court's concerns. If these negotiations are not successful, the Parties agree to participate in good faith in a mediation to address the Court's concerns. If after this mediation, the Parties are unable to agree on a revised consent decree, this Third Amended Consent Decree shall be deemed null and void.

32

**b. Construction.** The language in all parts of this Third Amended Consent Decree,

unless otherwise stated, shall be construed according to its plain and ordinary meaning.

**c. Authority to Sign.** The undersigned are authorized to execute this Third

Amended Consent Decree on behalf of their respective parties and have read, understood and

agreed to all of its terms and conditions.

THE UNDERSIGNED PARTIES HEREBY STIPULATE TO EACH AND EVERY

PROVISION OF THIS THIRD AMENDED CONSENT DECREE.

Dated: _____, 2013

_____
JODENE ISAACS, on behalf of plaintiff
Our Children's Earth Foundation

Dated: _____, 2013

_____
JASON ALLEN, on behalf of defendant
Standard Iron and Metals Company

**ORDER**

APPROVED AND SO ORDERED, this 15³ day of _August_, 2013.

_____

33

**b. Construction.** The language in all parts of this Third Amended Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning.

**c. Authority to Sign.** The undersigned are authorized to execute this Third Amended Consent Decree on behalf of their respective parties and have read, understood and agreed to all of its terms and conditions.

THE UNDERSIGNED PARTIES HEREBY STIPULATE TO EACH AND EVERY PROVISION OF THIS THIRD AMENDED CONSENT DECREE.

Dated: _June 19_, 2013

_____
JODENE ISAACS, on behalf of plaintiff
Our Children's Earth Foundation

Dated: _____, 2013

_____
JASON ALLEN, on behalf of defendant
Standard Iron and Metals Company

**ORDER**

APPROVED AND SO ORDERED, this ___ day of _____, 2013.

_____

33

   **b. Construction.** The language in all parts of this Third Amended Consent Decree,

unless otherwise stated, shall be construed according to its plain and ordinary meaning.

   **c. Authority to Sign.** The undersigned are authorized to execute this Third

Amended Consent Decree on behalf of their respective parties and have read, understood and

agreed to all of its terms and conditions.


   THE UNDERSIGNED PARTIES HEREBY STIPULATE TO EACH AND EVERY

PROVISION OF THIS THIRD AMENDED CONSENT DECREE.


Dated: _____, 2013

                              JODENE ISAACS, on behalf of plaintiff
                              Our Children's Earth Foundation


Dated: __6__/_19__/_____, 2013

                              JASON ALLEN, on behalf of defendant
                              Standard Iron and Metals Company


### ORDER

APPROVED AND SO ORDERED, this ___ day of _____, 2013.


_____


33

Case3:06-cv-00168-MJJ   Document34   Filed06/21/13   Page36 of 36

**EXHIBIT A to Third Amended Consent Decree (Exhibit B to original Decree)**

| Constituent | Water Quality Standard (WQS) | Basis for WQS | EPA Benchmark Level | EPA Analysis Method for Constituent |
|---|---|---|---|---|
| Total Suspended Solids | 100 mg/l | EPA Benchmark Level | 100 mg/l | Method 160.2 |
| Oil and Grease | 15 mg/l | EPA Benchmark Level | 15 mg/l | Method 1664A |
| Chemical Oxygen Demand | 120 mg/l | EPA Benchmark Level | 120 mg/l | Method 410.4 |
| pH | 6.5 to 8.5 s.u. | San Francisco Regional Water Quality Control Board Basin Plan ("Basin Plan"), Table 3-3 | 6.0 to 9.0 s.u. | Method 9040B |
| Specific Conductance | 200 umho/cm | EPA Benchmark | 200 umho/cm | Method 120.1 |
| Aluminum | 0.750 mg/l | EPA Benchmark | 0.750 mg/l | Method 6020 |
| Iron | 1.0 mg/l | EPA Benchmark | 1.0 mg/l | Method 6020 |
| Copper | 3.1 ug/l | CTR-Based Criteria: Saltwater Aquatic Life protection CCC (Chronic) | 63.6 ug/l | Method 6020 |
| Lead | 8.1 ug/l | CTR-Based Criteria: Saltwater Aquatic Life protection CCC (Chronic) | 81.6 ug/l | Method 6020 |
| Mercury | 2.1 ug/l | Basin Plan Table 3-3 (1 hr average) | 2.4 ug/l | Method 7470A |
| Nickel | 7.1 ug/l | CTR-Based Criteria: Saltwater Aquatic Life protection CCC (Chronic) | 1417 ug/l | Method 6020 |
| Zinc | 81 ug/l | CTR-Based Criteria: Saltwater Aquatic Life protection CCC (Chronic) | 117 ug/l | Method 6020 |